In re MUTUAL FUNDS INVESTMENT
LITIGATION.

In re Putnam Subtrack.

Saunders et al.

v.

Putnam American Government
Income Fund et al.

MDL No. 04–MD–15863.

Civil No. JFM–04–560.

United States District Court,
D. Maryland.

April 14, 2009.

## MEMORANDUM

J. FREDERICK MOTZ, District Judge.

On December 30, 2008, I issued an opinion addressing motions for summary judgment in the Putnam and Janus subtracks. *In re Mut. Funds Inv. Litig.*, 590 F.Supp.2d 741 (D.Md.2008). In the Putnam subtrack, I granted summary judgment for the Putnam defendants as to alleged arranged market timing, for which no credible evidence existed, and non-arranged market timing, for which no genuine issue of material fact as to defendants' scienter existed. *Id.* at 754, 758. I further found that while plaintiffs' claims of market timing by Putnam employees were meritorious, plaintiffs had been fully compensated for damages resulting from employee market timing, which the parties agreed were approximately $4.3 million, by defendants' payments pursuant to regulatory settlements. *Id.* at 755.[1] I also found meritorious plaintiffs' claims that defendants may be liable for market timing that occurred in defined contribution and 401(k) plans ("DC/401k plans"). *Id.* at 756. The parties agreed that if defendants were liable for this market timing, the damages would be approximately $55.6 million. *Id.* While defendants argued that plaintiffs had been fully compensated for any dam-

---

1. Plaintiffs assert, in an argument presented for the first time in their reply memoranda, that their claim should survive summary judgment because the identity of the individuals receiving restitution from the Fair Fund are unknown. (Lead Pls.' Mem. in Response to the Putnam Defs.' Supplemental Mem. of Law. in Further Supp. of Their Mot. for Summ. J. ["Pls.' Response"] 3.) However, plaintiffs present no evidence that the Fair Fund recipients would not include the proposed class members.

ages resulting from market timing in DC/401k plans by the regulatory settlements, I could not determine on the record before me whether those damages would indeed be completely offset. Therefore, I requested further briefing on this issue. *Id.* This briefing having now been completed, I find that the $55.6 million in damages caused by market timing in DC/401k plans is fully offset by the restitution paid by defendants pursuant to the regulatory settlements.

In 2003 and 2004, Putnam entered into Consent Orders with the SEC and the Massachusetts Securities Division ("MSD"). (Defs.' Ex. 141 [2003 SEC Partial Settlement Order]; Defs.' Ex. 145 [2004 SEC Order]; Defs.' Ex. 144 [2004 MSD Consent Order]; Defs.' Ex. 162 [2004 MSD Supplemental Consent Order].) Under these agreements, an independent third party, the Independent Assessment Consultant ("IAC"), would determine the amounts needed to fully compensate shareholders for losses caused by market timing by employees and in DC/401(k) accounts. (Defs.' Ex. 141 § IV.E.1; Defs.' Ex. 144, at 13.) The IAC for both the SEC and MSD Orders, Professor Peter Tufano, concluded that the losses potentially attributable to market timing trades in DC/401(k) plans amounted to $55.6 million, a figure that included dilution, administrative costs, and portfolio transaction costs. (Defs.' Ex. 146 tbl. 6, p. 9 [Report of Peter Tufano for the Commonwealth of Massachusetts].) The IAC found damages from employee market timing to be approximately $4.38 million. (*Id.*) He also calculated $48.5 million in costs associated with excess redemptions from the Putnam funds in late 2003 and 2004. (*Id.*) These three amounts total approximately $108.5 million. Plaintiffs do not disagree with these calculations or contest Tufano's methodology and findings. Putnam has paid this $108.5 million in restitution as well as a $40 million penalty to the MSD and a $45 million penalty to the SEC, resulting in total payments of $193.5 million.[2]

After excluding the portion of this $108.5 million in restitution that compensates plaintiffs for damages resulting from employee market timing (approximately $4.38 million), approximately $104.1 million remains available as an offset to damages caused by market timing in DC/401(k) accounts. (Putnam Defs.' Supplemental Mem. of Law in Further Supp. of Their Motion for Summ. J. 11.) This amount

---

**2.** Plaintiffs argue that $100 million of the amount Putnam paid pursuant to the regulatory settlements constituted penalty payments. This confusion results from certain amounts originally deemed penalty payments that were later allowed to be used as restitution. The SEC Order required an up-front payment, pending the independent determination of damages, of $5 million in restitution and a $50 million penalty. (Defs.' Ex. 145 § IV.A.) The Order provided that in the event the IAC found that full restitution would require a payment of more than $10 million, Putnam was to make an additional payment of the amount above $10 million. (*Id.* § IV.B.1.b.) This provision operated to credit $5 million of the $50 million SEC penalty as restitution, reducing the penalty portion to $45 million.

The MSD Consent Order initially required $5 million in restitution and a $50 million penalty, with the caveat that if the IAC determined losses to be greater than $5 million, Putnam could offset that amount against the $50 million penalty. (Defs.' Ex. 144, at 13–14.) The Supplemental Consent Order issued one week later required an immediate $40 million payment to the Commonwealth of Massachusetts, and provided that if Putnam paid more than $15 million in restitution overall, no further payment to the Commonwealth would be required. (Defs.' Ex. 162 § 3.b.) As the IAC did conclude that more than $15 million in restitution was due, the total penalty paid to the Commonwealth was $40 million. At the end of the day, then, the penalty amounts paid to the SEC and the MSD totaled $85 million.

more than offsets the $55.6 million in damages as calculated by the IAC.[3]

Plaintiffs contend that a genuine issue of material fact remains because the time period the IAC used to calculate restitution under the orders—January 1, 1997 through December 31, 2003—exceeds the class period. (Pls.' Mem. Regarding Fair Funds Offset Requested by the Court in its Dec. 30, 2008 Opinion 4; Pls.' Response 3.) As I stated in my December 2008 Order, the IAC's damages calculation may indeed be too high to the extent the calculation captures timing occurring prior to the class period. *In re Mut. Funds Inv. Litig.*, 590 F.Supp.2d at 755 n. 15. Plaintiffs, however, present no evidence that the IAC's calculation fails to account for any damages attributable to market timing in DC/401(k) plans during the class period. Thus, the fact that the IAC's calculation captures damages outside of the class period does not create an issue precluding summary judgment.

Therefore, summary judgment is granted for defendants as to market timing in DC/401k plans. This grants defendants' motion for summary judgment as to the 10b–5 claims in its entirety.[4] A separate order implementing this ruling follows.

## ORDER

For the reasons stated in the accompanying Memorandum and in the Opinion dated December 30, 2008, it is, this 14th day of April, 2009,

ORDERED:

1. Defendants' summary judgment motion is granted; and

2. Judgment is entered in favor of defendants against plaintiffs.

---

**3.** While plaintiffs maintain that the issue of flight damages precludes summary judgment, it does not. Even if plaintiffs were entitled to recover flight damages for the relevant time period—an issue on which I express no opinion—these damages would also be completely offset by the regulatory settlements. The IAC calculated $48.5 million in costs associated with excess redemptions from the Putnam funds in late 2003 and 2004, an amount Put-

nam has paid in full. This means that even if flight damages were recoverable, plaintiffs have been fully compensated.

**4.** The only remaining claim against the Putnam defendants is the Section 36(b) claim, which was asserted in a separate action by shareholders suing on behalf of the mutual funds. *See In re Mut. Funds Inv. Litig.*, 590 F.Supp.2d at 759–60.